## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **In re: Subpoena to Perkins Coie LLP, in the matter of *Steve Snyder-Hill, et al. v. The Ohio State University* (S.D. Ohio 2:18-cv-00736-MHW-EPD)** | **Case No.: 2:19-mc-00038**<br><br>**JUDGE MICHAEL H. WATSON**<br><br>**Magistrate Judge Deavers** |

## THE OHIO STATE UNIVERSITY'S RESPONSE TO THE
## MAGISTRATE JUDGE'S JANUARY 3, 2024 ORDER

Now comes The Ohio State University ("Ohio State"), by and through counsel, and respectfully submits its response to the Magistrate Judge's January 3, 2024 Order ("January Order") on the Motion to Quash filed by Perkins Coie, LLP ("Perkins Coie").

In Part IV of the January Order, the Court addressed Perkins Coie's assertion of work-product protection for subpoenaed notes and memoranda resulting from the witness interviews[1] that it conducted in connection with the firm's independent investigation of sexual abuse committed by Dr. Richard Strauss at The Ohio State University, and for information relating to the identity of these witnesses. (January Order, ECF No. 75, at PAGEID 455-458.) The Court acknowledged the compelling

---

[1] The Magistrate Judge's January Order directed Plaintiffs to confirm whether the only categories of documents at issue were three categories of information relating to non-survivor OSU witnesses, as well as a fourth category of historical OSU records uploaded by Perkins Coie into its electronic database. January Order, ECF No. 75, at PAGEID 450. OSU supports Perkins Coie's assertion of the work-product privilege not only with respect to information pertaining to the non-survivor witnesses interviewed by the firm, but to the entirety of the work product supporting Perkins Coie's final report.

interest in ensuring "a complete record for the Court's decision" with respect to the work-product doctrine[2] and invited additional briefing on that subject by Perkins Coie and Ohio State. (*Id.* at PAGEID 457-458.)

For the reasons set forth in the attached Memorandum and accompanying Declaration of Paula Paoletti, Ohio State's Deputy General Counsel and Senior Associate Vice President, the work-product doctrine (which is broader than the attorney-client privilege) indeed applies to the Perkins Coie notes and memoranda resulting from its interviews during the special investigation, as well as the identity of the witnesses interviewed. Plaintiffs cannot successfully invoke the "substantial need" exception to that doctrine, and neither Perkins Coie nor Ohio State have waived the protections afforded by that doctrine.

Respectfully submitted,

*/S/ Ryan P. Sherman*
Ryan P. Sherman (0075081)
Porter, Wright, Morris & Arthur, LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Telephone: (614) 227-2000
Facsimile: (614) 227-2100
Email: rsherman@porterwright.com

---

[2] Ohio State, as the client, holds and controls the attorney-client privilege. It has never waived that privilege, and it does not consent to the release of any information protected by the attorney-client privilege. Because Part V of the January Order (ECF No. 75 at PAGEID 458) only invites briefing on the work-product doctrine, however, the argument in the attached Memorandum is necessarily limited to that topic. For the avoidance of doubt, Ohio State restates and incorporates herein: (1) its prior assertions of the attorney-client privilege, as briefed in Ohio State's Motion to Intervene (ECF No. 29); (2) Perkins Coie's prior briefing on the privilege (ECF Nos. 1, 2, & 73); and (3) Perkins Coie's *in camera* production to the Court. Moreover, if the Court hears oral argument on the submissions made in response to the January Order, then Ohio State respectfully requests the opportunity to address *both* the attorney-client privilege *and* the work-product doctrine in those arguments.

Margo S. Brandenburg (0101183)
Porter, Wright, Morris & Arthur, LLP
250 East Fifth Street, Suite 2200
Cincinnati, OH 45202
Telephone: (513) 369-4223
Facsimile: (513) 421-0991
Email: mbrandenburg@porterwright.com

*Special Counsel for The Ohio State University*

<u>**MEMORANDUM IN SUPPORT**</u>

I.    **BACKGROUND**

The subpoena sought to be quashed demands production of documents created or compiled by Perkins Coie during its 2018-2019 independent investigation of allegations that Dr. Richard Strauss sexually abused Ohio State student athletes during his tenure as an Ohio State physician decades ago.  Ohio State initiated this independent investigation in April 2018.  Porter Wright, as Special Counsel appointed by the Ohio Attorney General to provide legal advice to Ohio State in connection with the matter, retained Perkins Coie to conduct the independent investigation.

As the attached Declaration of Paula Paoletti, Ohio State's Deputy General Counsel and Senior Associate Vice President who oversees all litigation for the University and the Ohio State Wexner Medical Center, confirms, Porter Wright, in consultation with OSU, engaged Perkins Coie to conduct an independent investigation into Dr. Strauss for two separate and distinct purposes: first, to discover and share the facts, support survivors, and promote closure; and second, to provide information that would help the University prepare for the litigation that was anticipated from the onset of Perkins Coie's engagement.  (*See generally* Paoletti Decl., attached hereto as Exhibit A.)  Perkins Coie was not retained simply to collect information; it was expected and necessary for the Perkins Coie lawyers to draw on their skills and experience *as lawyers* to compile and then assess and evaluate the evidentiary record (and to do so using survivor-centered, trauma-informed investigative techniques).  The investigation was undertaken to provide

Perkins Coie's factual assessments that Porter Wright, as Special Counsel and the University's Office of Legal Affairs ("Legal Affairs"), needed to provide *legal advice* to the University on an ongoing basis, both during and at the conclusion of the investigation.

The information and updates provided by Porter Wright and Perkins Coie were also used to evaluate and assess Plaintiffs' claims and assist Legal Affairs in advising the University on strategies to address the legal risk and anticipated litigation. In anticipation of that future litigation, the University engaged separate litigation counsel, Carpenter Lipps, LLP ("Carpenter Lipps"). Perkins Coie's work was managed separately from the litigation to preserve Perkins Coie's independence, but from the outset of the engagement, Ohio State understood that the results of Perkins Coie's independent investigation would be critical to provide facts and information necessary to assess and evaluate the allegations raised in the anticipated litigation. Accordingly, preparing the University for inevitable lawsuits was certainly a driving force for the Perkins Coie investigation and the work product that the firm generated during its investigation.

Perkins Coie completed its investigation and delivered its findings on May 15, 2019. It did so by providing Porter Wright and the University with a Report that thoroughly assessed and evaluated the allegations against Dr. Strauss and University personnel's knowledge of those allegations at the time. In May of 2019, that Report, which confirmed many of the allegations, along with thousands of non-privileged documents, were released to the public. Since then, the Plaintiffs in the underlying

2

litigation – and the public – have had access to the documentary evidence cited in the Report, as well as to all of Ohio State's public records related to Dr. Strauss that were identified and located through Perkins Coie's efforts during the investigation.

Certain information Plaintiffs now seek from Perkins Coie via their subpoena, however, has *not* been released to any third-party[3] or to the public because it is protected by the attorney-client privilege and the work-product doctrine.  So, on July 12, 2019, Perkins Coie moved to quash the Plaintiffs' subpoena to the extent that it sought information protected from disclosure, and to the extent that the subpoena was overly broad and unduly burdensome.  (Motion to Quash, ECF Nos.  1 & 2.)

After directing the *in camera* submission of engagement letters, in its January Order, the Court made the following orders:

- the Court directed Plaintiffs to clarify the scope of at-issue documents;

- the Court directed Perkins Coie to submit representative samples for *in camera* review; and

- the Court invited additional briefing regarding the assertion of work-product protection.

(January Order, ECF No.  75, PAGEID 458.)

---

[3] During its independent investigation, Perkins Coie did not share the documentary output of its work with Ohio State.

On January 10, 2024, Plaintiffs submitted a response to the January Order regarding the scope of what they seek to obtain from Perkins Coie, including: "(1) the identity of OSU witnesses described in Perkins Coie's Report; (2) Perkins Coie's notes of communications with those witnesses; (3) its written communications with non-survivor OSU witnesses; and (4) OSU records which Perkins Coie uploaded into its electronic discovery database."  (Plaintiffs' Response, ECF No.  76, PAGEID 459.)  As detailed below, binding Sixth Circuit precedent on the scope of the work-product doctrine confirms that the doctrine compels the Court to quash the Plaintiffs' subpoena for the categories of information Plaintiffs seek from Perkins Coie.

## II.   THE WORK-PRODUCT DOCTRINE APPLIES TO THE MATERIALS SOUGHT BY PLAINTIFFS.

### A.   As both the Supreme Court and the Sixth Circuit have recognized, the work-product doctrine provides a protection from disclosure that is separate and broader than the attorney-client privilege.

The work-product doctrine "'is distinct from and broader than the attorney-client privilege.'"  *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986) (quoting *United States v. Nobles*, 422 U.S. 225, 238 n.11, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975).)  As the Sixth Circuit explained in the *Antitrust Grand Jury* case:

> Where only confidential communications are protected by the attorney-client privilege, the work-product doctrine <u>more broadly</u> protects <u>any document prepared in anticipation of litigation by or for the attorney</u>.  *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980). Moreover, only the client may assert the attorney-client privilege while both the attorney and the client may invoke the work-product doctrine.  *Id*.

*In re Antitrust Grand Jury*, 805 F.2d at 163 (emphasis added).

   **B.    The work-product doctrine extends to witness statements obtained in the course of an investigation such as the Perkins Coie investigation, conducted by an attorney or the attorney's agent, as well as to notes and memoranda regarding those interviews.**

   The work-product doctrine extends broadly to facts obtained and recorded by the attorney, as well as the attorney's opinions and theories.  *Id*.  "Fact" work product refers to "written or oral information transmitted to the attorney and recorded as conveyed by the client." *Id*.  Fact work product includes, but is not limited to, "interviews, statements, memoranda, [or] correspondence," recording information conveyed by the client.  *Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 174, 2010-Ohio-4469, 937 N.E.2d 533, ¶ 544.  *See also State v. Hoop*, 134 Ohio App.3d 627, 642, 731 N.E.2d 1177 (1999) (recognizing that fact work product includes witness statements, citing the Sixth Circuit's opinion *In re Antitrust Grand Jury*).  Moreover, as this Court has noted, the work-product doctrine extends to verbatim recordings or transcripts of witness interviews.  *See CSX Trans., Inc. v. Columbus Downtown Develop. Corp.*, No. 2:16-cv-557, 2019 U.S. Dist. LEXIS 67834,  at *14 (S.D. Ohio Apr. 22, 2019) (audio recording of witness interview obtained during an internal investigation protected by work-product doctrine); *see also Feacher v. Intercont'l Hotels Group*, No. 3:06-CV-0877 (TJM/DEP), 2007 U.S. Dist. LEXIS 78262, at *8-9 (N.D.N.Y. Oct. 22, 2007) (holding that the work-product doctrine apples to a transcript of a witness statement, rejecting the contention that it did not apply to "a mere verbatim witness statement taken by an investigator," and noting that

"analysis of the questions asked when securing an otherwise purely factual account from a potential witness could indirectly provide enlightenment as to the litigation strategy being developed or explored.").  And both *Upjohn Co. v. United States*, 449 U.S. 383, 400 (1981), and *FTC v. Bass Bros. Enterprises, Inc.*, No. C84-1304; No. C84-1311., 1984 U.S. Dist. LEXIS 16889, at *4 (N.D. Ohio May 8, 1984), hold that memoranda of witness interviews qualify as opinion work product.

**C.**  **Under the Sixth Circuit's *Roxworthy* test, the work-product doctrine applies when witness statements or other information can fairly be said to have been obtained "because of" the prospect of litigation.**

The Court's January Order cites the Sixth Circuit's decision in *United States v. Roxworthy*, 457 F.3d 590, 599 (6th Cir. 2006), which set forth this Circuit's test for determining whether information qualifies as having been prepared in anticipation of litigation for purposes of work-product protection.  In *Roxworthy*, the Sixth Circuit held that the trial court erroneously denied a motion to quash a subpoena for memoranda that were created for the *dual purposes* of tax planning *and* potential IRS litigation.  *Id.* at 600-601.  There, the Sixth Circuit adopted the "because of" test articulated in Wright and Miller's treatise on federal practice and adopted by other Circuits, holding that work product protection applies to documents created "because of the prospect of litigation." *Id.* at 593.  As commentators have explained, this approach is "more inclusive" than the approach of requiring a document to be prepared "primarily or exclusively to assist in litigation."  6 Moore's Federal Practice, Civil § 26.70[3][a] (2023).  "The 'because of'

6

inquiry offers a more administrable standard, effectively resolving uncertainty at the margins *in favor of work product protection*."  *Id.* (emphasis added).

The Sixth Circuit further held in *Roxworthy* that district courts should ask the following two questions to determine whether a particular document can be said to have been created "because of" litigation:

> (1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable.

*Id.* at 594.  When the answer to these questions is "yes," and where the expectation for litigation is "quite concrete," the work-product doctrine will protect memoranda created for a dual purpose, even if that information is generated before any "overt indication" that a specific party intends to file a specific lawsuit.  *Id.* at 600.

**D.**     **The Declaration of Paula Paoletti confirms the applicability of the work-product doctrine under the *Roxworthy* test.**

Attached to this brief as Exhibit A is the Declaration of Paula Paoletti, Ohio State's Deputy General Counsel and Senior Associate Vice President.  The statements in her Declaration[4] confirm that the work-product doctrine applies to the materials sought by Plaintiffs.

---

[4] Ohio State notes that the content of the representative samples submitted by Perkins Coie, in addition to the averments in Ms. Paoletti's Declaration, can support application of the work-product doctrine. The *Roxworthy* court also addressed how an objecting party, as a practical matter, may satisfy its evidentiary burden of showing anticipation of litigation, approving "'any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories,'" and that the showing "'can be opposed or controverted in the same manner.'" *Roxworthy*, 457 F.3d at 597 (quoting *Toledo Edison Co. v. G.A. Techs., Inc.*, 847

Ms. Paoletti oversees all litigation involving the University and the Ohio State Wexner Medical Center—a position she has held since May 2018. (Paoletti Aff., ¶ 1.) From August 2012 through April 2018, as Associate Vice President and Senior Associate General Counsel, she oversaw all litigation for the Ohio State University Wexner Medical Center. (*Id.*) As Ms. Paoletti describes, the University was first made aware of allegations of improper sexual conduct by Dr. Strauss in late March 2018, when the first complainant alleged that he and other student-survivors had been sexually assaulted by Dr. Strauss during their time as students. (*Id.* at ¶ 3.) After becoming aware of these allegations, Ms. Paoletti and other in-house counsel at the University were immediately engaged to evaluate the allegations and advise the University on appropriate next steps. (*Id*. at ¶ 4.)

From the outset, Ms. Paoletti and her Legal Affairs colleagues recognized the potential for litigation arising from these allegations of sexual assault. (*Id*. at ¶ 5.) The threat of litigation that Legal Affairs subjectively perceived was underscored when the first complainant reached out to the University in late March 2018 seeking to reach a resolution on behalf of himself and other survivors, and advising that the matter would be referred to the Ohio Attorney General ("AG")'s Office if a resolution could not be reached. (*Id.* at ¶ 6.) The fact that the first complainant had previously litigated other matters with the University only heightened the prospect of litigation. (*Id.*)

---

F.2d 335, 341 (6th Cir. 1988).)

Ms. Paoletti and her Legal Affairs and Compliance colleagues also came to understand that, in addition to the prospect for civil litigation, the Office for Civil Rights of the United States Department of Education would likely investigate the University's response to the allegations regarding Dr. Strauss, and that the University could be the subject of a federal administrative proceeding based upon its handling of the matter. (*Id*. at ¶ 7.)

Because of the breadth and scope of the allegations, their impact on students and the University itself, and the likelihood (indeed, certainty) of litigation, Ohio State quickly decided to engage outside counsel to conduct a thorough and independent investigation of Dr. Strauss's conduct. (*Id*. at ¶ 5.)

In order to maintain the independence of the investigation, and to at the same time (and in parallel tracks) obtain legal advice on the findings of that investigation as it unfolded, Ohio State (through the AG) engaged the law firm of Porter, Wright, Morris & Arthur, LLP ("Porter Wright") as special counsel in April 2018 to oversee an independent investigation. (*Id*. at ¶ 8.) Porter Wright had long served as counsel for the University in numerous other litigated matters. (*Id*.) Then, after a national search, also in April 2018, Porter Wright engaged Perkins Coie to conduct the independent investigation, based on that firm's experience handling sensitive and complex trauma-informed and survivor-centered investigations. (*Id*. at ¶ 9.)

As Porter Wright was engaged as special counsel and Perkins was engaged to conduct the independent investigation, the University also requested the engagement of special counsel through the AG to represent the University in the anticipated litigation. (*Id*. at ¶ 10.) Carpenter Lipps, LLP ("Carpenter Lipps") was engaged on May 2, 2018 to represent the University as trial counsel in the anticipated future litigation, and the first lawsuit was filed against the University very soon thereafter on July 16, 2018. (*Id*.)

Perkins Coie was retained and charged with assessing and evaluating allegations raised by complainants against Dr. Strauss (as they relate to the University), and whether the University had knowledge of such allegations. (*Id*. at ¶ 11.) More specifically, Perkins Coie was engaged to conduct a thorough, unbiased, and independent investigation to assess the recent allegations received by the University, to discover what still-available facts surrounding those allegations existed, and also to determine the extent of University personnel's knowledge of Dr. Strauss's conduct at that time. (*Id*. at ¶ 12.)

The fact that the investigation was undertaken in anticipation of litigation, and that litigation was filed during the investigation, in no way changed or influenced the independence or integrity of Perkins Coie's work. (*Id*.) The independence of Perkins Coie's investigation was preserved throughout the duration of their investigation. (*Id*.) The Perkins Coie Report sets forth the numerous steps that were taken to ensure the independence of the investigation, including the fact that the University was not provided an advance copy of the Report. (*Id*.)

10

Perkins Coie at the outset was advised that the information uncovered during its independent investigation would be shared with Porter Wright and Legal Affairs to assist the University in assessing the expected claims, including among other things, determining the breadth and extent of Dr. Strauss's conduct, the potential number of survivors and their likely claims, and the extent of the University personnel's knowledge of Dr. Strauss's conduct.  (*Id.* at ¶ 13.)

Moreover, Perkins Coie's role was not merely to gather information, but also to apply its legal expertise and experience conducting sensitive and complex trauma-informed, survivor-centered independent investigations to evaluate the facts, assess witness credibility and claims, provide their mental impressions and opinions to the facts they were uncovering, and ultimately to report on Strauss's conduct, University personnel's knowledge of that conduct, and the actions taken by University personnel in connection with that conduct.  (*Id.* at ¶ 13.)

And throughout the course of its investigation, the Perkins Coie team provided periodic updates to Porter Wright, the University, and the AG's office (these, notably, were one-way communications in the sense that Perkins Coie provided updates on the facts; neither Porter Wright, the University, nor the AG's office during these calls – or otherwise – directed or otherwise sought to influence Perkins Coie's investigation).  (*Id.* at ¶ 14.)  The updates from Perkins Coie both informed the University on the scope, significance, and legal risk and exposure flowing from Dr. Strauss's historical actions and

the witnesses' recollections thereof, and concurrently assisted Legal Affairs in advising the University on strategies to address the legal risk. (*Id.*)

In sum, Ms. Paoletti avers that at the time of Perkins Coie's retention to conduct the investigation, it was expected that the University would almost certainly face lawsuits brought by former student-survivors of Dr. Strauss's abuse. That subjective expectation on Ms. Paoletti's part – one shared by Legal Affairs, Ohio State and its Board, which engaged Carpenter Lipps as litigation counsel – was also objectively reasonable under *Roxworthy*, particularly given the then-recent spate of litigation against other Big10 universities also facing allegations of past sexual misconduct. As Ms. Paoletti's Declaration confirms, a core purpose of the Perkins Coie investigation was to provide the University with a thorough and independent evaluation and assessment of the allegations against Dr. Strauss and University personnel's knowledge of those allegations at the time so that it could seek legal advice as how to respond, knowing that litigation was imminent. Under *Roxworthy*, both subjectively and objectively, there is no doubt that Perkins Coie's investigation was undertaken "because of" anticipated litigation, and that litigation was a driving force of the investigation.

### E. Precedent from elsewhere confirms the applicability of the work-product doctrine under the "because of" test.

Some persuasive cases from other federal courts deserve mention as the Court considers whether the work-product doctrine applies to the categories of information now sought by Plaintiffs regarding the Perkins Coie investigation.

Take, for example, the Seventh Circuit's opinion in *Sandra T.E. v. South Berwyn Sch. Dist.*, 600 F.3d 612 (7th Cir. 2009).  That case, like this one, concerned a law firm hired to perform an investigation regarding a school employee who had been accused of molesting students.  And that case, like this one, concerned a subpoena issued to the law firm seeking discovery regarding the contents of the firm's investigation file.  After a motion to quash was denied, the law firm in *Sandra T.E.* turned over more than 1,000 pages of documents, but the firm withheld information similar to that identified in Perkins Coie's Motion to Quash, including notes and memoranda from the witness interviews and other internal legal memoranda prepared in connection with the investigation.  After unsuccessfully seeking to compel production of the documents directly from the defendants, the plaintiffs in *Sandra T.E.* served a second subpoena on the law firm, and the district court ordered the firm to produce the notes and internal memoranda.  On appeal, however, the Seventh Circuit reversed, reasoning that the affidavits submitted by the law firm, the engagement letter, and other evidence in the record demonstrated that the investigation was performed by attorneys in their roles as attorneys and was protected both by the attorney-client privilege and the work-product doctrine.  With respect to the work-product doctrine, the Seventh Circuit applied the same "because of" test that the Sixth Circuit applied in *Roxworthy*.  *See Sandra T.E.*, 600 F.3d 612, 622 ("Work-product protection applies to attorney-led investigations when the documents at issue 'can fairly be said to have been prepared or obtained because of the

13

prospect of litigation.'") (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996)).

In *Jane DOE 1 v. Baylor Univ.*, No. 6:16-CV-173-RP, 2018 U.S. Dist. LEXIS 248761 (W.D. Tex. Nov. 16, 2018), the district court had previously specified which Pepper Hamilton law firm investigatory materials Baylor University could properly withhold as attorney work product, including:

> (1) interview memoranda, notes, emails, presentations, and other documents and tangible things that were prepared as part of Pepper Hamilton's investigation, and have not been released, (2) responses to questions that "directly seek the mental impressions of Baylor's counsel," for example, "identifying which documents and interviews formed the bases [of the Findings of Fact or Recommendations]," (3) documents selected by Pepper Hamilton to be used in an interview, (4) recordings of interviews conducted by Pepper Hamilton, and (5) interview notes made by Pepper Hamilton.

*Jane DOE 1*, *supra*, at *14. The district court then extended its previous orders governing production of Pepper Hamilton materials to all current and former employees. *Id.*

Similarly, in *Chase v. Nova Se. Univ., Inc.*, No. 11-61290-CIV, 2012 U.S. Dist. LEXIS 83815 (S.D. Fla. June 18, 2012), a university had outside counsel investigate a professor who discussed possessing and shooting a gun on campus. The outside counsel interviewed 11 faculty members and others and presented an Executive Summary. The terminated professor was not given access to interview summaries by the District Court because the court concluded that even if the investigation had more than one purpose,

14

the work-product doctrine applied under Wright & Miller's (and the Sixth Circuit's)

"because of" test. *Id.* at *15-18. Specifically, the *Chase* court noted that:

> even if the investigation and concomitant documents had more than one
> purpose that would not preclude the application of the work product
> doctrine here. The Court finds that the litigation purpose of creating the
> documents "so permeates any non-litigation purpose that [other purposes]
> cannot be discretely separated from the factual nexus as a whole."

*Id.* at *18. *See also Hale v. Emporia State Univ.*, No. 16-cv-4182-DDC-TJJ, 2018 U.S. Dist.

LEXIS 26562 (D. Kan. Feb. 20, 2018) (under "because of" test in racial discrimination case

against university, work-product doctrine applied to drafts of investigation reports,

investigation notes, and notes regarding interviewees).

**F.      Ohio State's prior description of the Perkins Coie investigation as
       "unrelated to any future adversarial or litigation proceedings" does not
       undermine the applicability of the work-product doctrine.**

In its January Order, the Court noted "with particularity" and directly quoted text

from Ohio State's response to Plaintiffs' motion for a conference in the underlying actions

to suggest that Ohio State itself had undermined its assertion of work product.  (January

Order, ECF No. 75, PAGEID 457.)[5] Ohio State understands why the inartful wording of

this particular assertion in Ohio State's prior briefing caught the Court's attention.

Respectfully, the intent of the University's prior statement was to convey that the Perkins

---

[5] In the text quoted by the Court on page 10 of the January Order, Ohio State asserted that "Ohio State separately engaged Porter Wright to oversee an independent, external investigation, **unrelated to any future adversarial or litigation proceedings**.  The resulting investigation and report were informative to Ohio State to bring closure to the community regarding behavior by Dr.  Richard Strauss from decades ago.  What information that was still available after 20-40 years assisted Porter Wright and Perkins Coie in accomplishing that objective."  (Emphasis added by the Court.)

Coie investigation was managed and operated independently from the litigation and that the University's investigatory counsel was not directly involved in, and had never appeared in, any of the lawsuits.  As the Statement of Independence in the Perkins Coie report itself states, its investigative team "developed the investigative workplan independently—without direction from the University—and executed the workplan without interference or obstruction by the University."[6]  The assertion from Ohio State's prior response quoted by the Court was not intended to suggest that the investigation served no litigation purpose, nor that the information gleaned from that investigation was not critical to informing Ohio State's response to the litigation.  As Ms. Paoletti testifies, Perkins Coie was advised that the information it uncovered during the independent investigation would be shared with Porter Wright and Legal Affairs to assist in assessing expected claims.  (Paoletti Decl. at ¶¶ 13-14.)

### G. The Plaintiffs cannot establish a substantial need for the information protected by the work-product doctrine.

The common-law work-product privilege is incorporated in Federal Rule of Civil Procedure 26(b)(3).  That rule provides an exception if the party seeking the information qualifying as work product can meet its burden to show a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial

---

[6] Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University (Redacted Copy), at 8, *available at*: https://presspage-production-content.s3.amazonaws.com/uploads/2170/reportoftheindependentinvestigationaccessible-376071.pdf?10000 (last accessed Jan. 15, 2024).

16

equivalent by other means." This exception does not apply here because the Plaintiffs cannot, and for that matter have not even attempted to, meet that burden.

As a threshold matter, in the Southern District of Ohio, to prove substantial need for work product, a party must do more than prove that the documents sought are "relevant." *Fresenius Med. Care Holdings, Inc. v. Roxane Labs, Inc.*, No. 2:05-cv-0889, 2007 U.S. Dist. LEXIS 12018, at *8 (S.D. Ohio Feb. 16, 2007). "Rather, '[s]ubstantial need is clearly shown when the materials sought are essential to prove the discovering party's case, or where without the information a distinct advantage would accrue to the party having it.'" *Laws v. Stevens Transp., Inc.*, No. 2:12-cv-544, 2013 U.S. Dist. LEXIS 22159, *9 (S.D. Ohio Feb. 19, 2013) (quoting *Georgine v. Amchem Prods., Inc.*, No. 93-0215, 1994 U.S. Dist. LEXIS 12996 (E.D. Pa. Sept. 2, 1994)).

As Perkins Coie explained in its Reply in Support of its Motion to Quash (ECF No. 73, PAGEID 441-442) – an explanation that Ohio State incorporates as if fully set forth herein – Plaintiffs' purported desire to "refresh the recollection" of witnesses is not, as a matter of law, a need that is sufficiently substantial to override work-product protections. Moreover, information about OSU witnesses and the medical personnel with whom Dr. Strauss worked is publicly available and/or can be obtained directly from OSU. In fact, Plaintiffs have now for years been able to access the same documents and records that Perkins Coie had access to during its investigation. Yet tellingly, Plaintiffs fail to address what, if any, efforts they have made to obtain this information from other sources, instead

of from Perkins Coie's work product.  Their failure to demonstrate a substantial need for the identity of and communications with witnesses they already have access to provides an independent basis to quash their subpoena.  Finally, it should be noted that even if the Court concludes that Plaintiffs have a substantial need for some portion of Perkins Coie's work product, any *opinion* work product that includes the Perkins Coie lawyers' mental impressions and legal theories must be redacted before production.  *See* FED. R. CIV. P. 26 & Advisory Committee Notes to 1970 Amendments.

###### H. Neither Ohio State nor Perkins Coie has waived, or is willing to waive, work-product protection over the requested information.

As noted above, the work-product doctrine is broader than the attorney-client privilege and may be invoked by either the client or the attorney.  *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986).  Conversely, it cannot be waived unless the attorney <u>*as well as the client*</u> both agree.  Here, for the reasons previously explained by Perkins Coie in its Reply in Support of the Motion to Quash (ECF No. 73, PAGEID 438-441), which Ohio State incorporates as if fully set forth herein, neither the University nor Perkins Coie has waived work product or is willing to do so now.  In fact, Perkins Coie, the University and Porter Wright, throughout the investigation and continuing to the present, have been vigilant in maintaining confidentiality and work product protection for witness interview and related materials.

Opposing Perkins Coie's Motion to Quash, the Plaintiffs contend that the University waived work-product protection when it "published its Report to the world."

(Plaintiffs' Opposition, ECF No. 35, PAGEID 205.)  But the issuance of the Report of the Perkins Coie Investigation did not constitute a waiver.  *Accord*, *Waters v. Drake*, No. 2:14-cv-1704, 2016 U.S. Dist. LEXIS 196623, at *3 (S.D. Ohio Feb. 4, 2016).  In *Drake*, this Court denied a motion to compel production of privileged documents related to a publicly issued report where the university did not "voluntarily inject issues about the adequacy of its investigative process into the litigation."  *Id.*  As the Eastern District of Louisiana explained, "[t]he publication of a final investigative report does not waive the protection for the underlying drafts and materials because the work-product doctrine exists not to protect a 'confidential relationship,' but rather to 'promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent."  *In re Vioxx Prods. Liab. Litig.*, No. 1657, 2007 U.S. Dist. LEXIS 23164, at *5 (E.D. La. Mar. 5, 2007).  *See also United States ex rel.  Fago v.  M & T Mortg.  Corp.*, 235 F.R.D. 11, 17 (D.D.C.  2006) (same).  Here, not only is the University *not* affirmatively utilizing the Report in litigation filed against it, but the University is also actively *denying admissibility* of the Report in such litigation.  (*See generally* Ohio State's Opposition to Plaintiffs' Mot. to Admit Perkins Coie Report into Evidence, *Snyder-Hill et al. v. The Ohio State University*, S.D. Ohio Case No. 2:23-cv-02993, ECF No. 29.)  As the University explains in that recent submission to the Court, while it certainly respects the Report, the Report is inadmissible hearsay (or inadmissible under Fed. R. Evid. 402/403) and each plaintiff must prove his individual allegations in litigation.  (*Id.* at PAGEID 1163-1174.)

19

III.    CONCLUSION

For the foregoing reasons, in addition to qualifying for the attorney-client privilege, the categories of information now sought by Plaintiffs relating to the Perkins Coie investigation are properly shielded from production by the work-product doctrine, which has not been waived. Nor can Plaintiffs demonstrate a substantial need for the information they seek.  Compelled production of any one or more of those categories of information would give Plaintiffs improper access to counsel's thoughts, impressions, and legal strategies – precisely the result the work-product doctrine is intended to avoid.

Respectfully submitted,

*/S/ Ryan P. Sherman*
Ryan P. Sherman (0075081)
Porter, Wright, Morris & Arthur, LLP
41 South High Street, Suite 2900
Columbus, OH  43215
Telephone: (614) 227-2000
Facsimile: (614) 227-2100
Email:  rsherman@porterwright.com

Margo S. Brandenburg (0101183)
Porter, Wright, Morris & Arthur, LLP
250 East Fifth Street, Suite 2200
Cincinnati, OH 45202
Telephone: (513) 369-4223
Facsimile: (513) 421-0991
Email: mbrandenburg@porterwright.com

*Special Counsel for The Ohio State University*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served by e-Service upon counsel for each party entitled to service on January 17, 2024.  The attached document was submitted for E-filing on that date which is designated as the date of service of this document.


*/s/ Ryan P. Sherman*

*Special Counsel for The Ohio State University*