## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**In re: Subpoena to Perkins**     **Case No. 2:19-mc-38**
**Coie LLP**           **Magistrate Judge Elizabeth P. Deavers**

### <u>OPINION AND ORDER</u>

This matter is before the Court to consider the Motion to Quash filed by Perkins Coie LLP ("Perkins Coie"). (ECF Nos. 1, 2.) The Plaintiffs in the underlying cases, originally filed as *Snyder-Hill v. The Ohio State University*, Case No. 2:18-cv-736 ("*Snyder-Hill*") and *Garrett v. The Ohio State University*, Case No. 2:18-cv-692 ("*Garrett*"), filed a Response.[1] (ECF No. 35.) On November 17, 2023, the Court lifted the stay previously entered on July 14, 2020 (ECF No. 45) and reinstated the Motion to Quash. (ECF No. 70.) Perkins Coie filed its Reply on December 8, 2023. (ECF No. 73.)

By Order dated December 14, 2023, the Court directed the *in camera* submission of the Engagement Letters between Perkins Coie and Special Counsel Porter, Wright, Morris & Arthur LLP ("Porter Wright") and between Porter Wright and Intervenor The Ohio State University ("OSU")[2]. (ECF No. 74.) On December 18, 2023, the Engagement Letters were submitted as directed. Based upon the Court's review of both the Engagement Letters and the record of the case, the Court ordered the *in camera* submission of a representative sample of Perkins Coie's written communications and its notes of communications with ten (10) non-survivor OSU former or current employee witnesses. (ECF No. 75.) The Court also permitted additional briefing

---

[1] Plaintiffs in *Garrett* did not join in nor issue a separate subpoena and appear to be participating in this case strictly as "Interested Parties."

[2] OSU's Motion to Intervene (ECF No. 29) was granted by Order dated June 26, 2020 (ECF No. 39).

addressed to the issue of work product protection. (*Id.*) The Court now has reviewed Perkins

Coie's *in camera* submissions and the additional briefing has been submitted. And, as ordered,

Plaintiffs have confirmed that the categories of documents at issue are the

> four categories of information identified in Plaintiffs' response to Perkins Coie
> LLP's ("Perkins Coie") motion to quash Plaintiffs' subpoena, *see* ECF No. 35 (Pls.'
> Response) at 2: "(1) the identity of OSU witnesses described in Perkins Coie's
> Report; (2) Perkins Coie's notes of communications with those witnesses; (3) its
> written communications with non-survivor OSU witnesses; and (4) OSU records
> which Perkins Coie uploaded into its electronic discovery database." Plaintiffs are
> not seeking the identity of, notes of communications with, or communications with
> the 177 survivor witnesses but are seeking the identity of, notes of communications
> with, and communications with current and former OSU employees, third-
> party/non-OSU witnesses, and other student witnesses—categories delineated in
> Perkins Coie's chart of "Number and Category of Witnesses Interviewed"—and
> included within Plaintiffs' underlying requests.

(ECF No. 76; *see also* ECF No. 80.) Thus, the matter is ripe for decision. The motion is before

the Undersigned for consideration with the consent of the parties. (ECF No. 88), 28 U.S.C. §

636(c). For the following reasons, the Motion to Quash is **GRANTED, in part**, **DENIED, in**

**part,** and **HELD IN ABEYANCE, in part.**

## I.

Rule 45 of the Federal Rules of Civil Procedure governs third-party subpoenas. Fed. R.

Civ. P. 45. Rule 45 permits parties in legal proceedings to command a non-party to attend a

deposition, produce documents, and/or permit inspection of premises. Fed. R. Civ. P. 45(a)(1).

The Rule provides that the person commanded to produce documents may serve an objection on

the party or attorney designated in the subpoena within the earlier of fourteen days after the

subpoena is served or the time specified for compliance. Fed. R. Civ. P. 45(d)(2)(B).

Upon a timely motion to quash, a court "must quash or modify a subpoena" that "fails to allow a

reasonable time to comply," requires a non-party to travel more than 100 miles, "requires

disclosure of privileged or other protected matter," or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).

## II.

Perkins Coie seeks to quash the subpoena primarily on the basis of work product protection and attorney-client privilege. As discussed more fully below, Perkins Coie raises ancillary issues as well. Briefly, the Court provides the following factual background.

In April 2018, the Ohio Attorney General appointed Porter Wright to serve as Special Counsel to OSU for purposes of an investigation into the sexual misconduct allegations surrounding Dr. Strauss. (Declaration of Paula Paoletti, ECF No. 77-1 at ¶ 8 "Paoletti Decl.") Porter Wright was to provide legal advice to OSU. (*Id*.) In turn, on April 27, 2018, Porter Wright retained Perkins Coie to "conduct an independent factual investigation" (the "Investigation"). (Executive Summary, Report of the Independent Investigation dated May 15, 2019, the "Report.")[3] Certain terms of the Engagement Letter between Perkins Coie and Porter Wright are reflected in the public Report which states

> The defined scope of the Independent Investigation was, first, to evaluate allegations that Strauss committed acts of sexual misconduct against members of the OSU community while he was employed by the University, and, second, to determine whether "the University" had knowledge of sexual misconduct allegations against Strauss during the relevant time period.

(Report at 7; *see also* ECF No. 35-2.) Beyond reflecting the scope of the engagement, the Report further explains that Perkins Coie was "explicitly retained to only reach factual findings, and not to draw legal conclusions," and "was not asked to assess or otherwise provide recommendations to [OSU] regarding its current or historical policies, procedures, or practices related to sexual

---

[3] As cited by Perkins Coie, the Report can be found at https://compliance.osu.edu/strauss-investigation.html. (ECF No. 2 at 5, n.4.)

abuse or sexual misconduct." (Report at 7.) Perkins Coie's "professional fees and expenses were paid by [OSU]" but Perkins Coie "provided no legal advice to [OSU]." (*Id*.) The Report further confirms that the Investigative Team assembled by Perkins Coie "developed the investigative workplan independently - without direction from the University – and executed the workplan without interference or obstruction by the University." (*Id.* at 8; *see also* ECF No. 35-2.) Perkins Coie was asked to deliver its findings to OSU through Porter Wright at the conclusion of the Investigation. (*Id*. at 9.) OSU was not provided an "advance draft copy" of the Report. (*Id.*)

Perkins Coie conducted "approximately 600 interviews with 520 interviewees." (Report at 18.) The witness categories included "Survivors," "Other Student Witnesses," "Former University Employees," "Current University Employees," and "Third Party/Non-OSU Witnesses." (*Id*.) More specifically, Perkins Coie interviewed 177 "Survivors." (*Id*. at 17.) Perkins Coie also interviewed 94 "Other Student Witnesses," 169 "Former University Employees," 53 "Current University Employees" and 27 "Third Party/Non-OSU Witnesses." (*Id*.) These latter categories of witnesses are collectively referred to below as "Non-Survivor Witnesses."

## III.

Turning first to Perkins Coie's claim that all of the documents underlying the publicly-released Report constitute protected work product, the work product doctrine "protects from discovery documents and tangible things prepared in anticipation of litigation by or for a party or by or for that party's representative." *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006). The burden of proving that an item is prepared in anticipation of litigation falls to the party asserting the privilege. *Id.* The Sixth Circuit has adopted the "because of" test to

4

determine whether this standard is met. This test requires the asserting party to prove that the item was "prepared or obtained *because of* the prospect of litigation." *Id.* (quoting *United States v. Adlman (Adlman II)*, 134 F.3d 1194, 1202 (2d Cir. 1998)). This determination involves both a subjective and an objective inquiry. That is, a court must consider "(1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *Id.* at 594. Items "prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for non-litigation purposes," however, are not protected by the work-product doctrine. *Id.* at 593. "Thus, if an item would have been prepared in substantially the same manner, regardless of the anticipated litigation, the doctrine does not apply." *Id.* at 593–94.

As the Court already has recognized, OSU had a reasonable subjective anticipation of litigation under the well-documented surrounding circumstances. (ECF No. 75 at 9.) Indeed, the first Complaints in the underlying actions were filed approximately three months after Perkins Coie's engagement by Porter Wright and while Perkins Coie was undertaking its Investigation.[4] Nevertheless, the Court, citing the equivocal record evidence, found support for a finding of work product lacking and ordered additional briefing. OSU responded, supporting its filing with a declaration from Paula Paoletti, Deputy General Counsel & Senior Associate Vice President for OSU. (ECF Nos. 77, 77-1.)

Ms. Paoletti's Declaration, as Ms. Trombino's Declaration before it, merely confirms that OSU anticipated litigation and that OSU's anticipation was reasonable. The reasonableness of

---

[4] The original *Garrett* case was filed on July 16, 2018 (Case No. 2:18-cv-692) and the original *Snyder-Hill* case was filed on July 26, 2018 (Case No. 2:18-cv-736).

5

anticipated litigation, however, is not in dispute here. Nor is it dispositive. Instead, the Court

must also consider whether the materials at issue "'would have been created in substantially

similar form irrespective of the anticipated litigation.'" *Roxworthy*, 457 F.3d 590, 599 (quoting

*United States v. Aldman (Aldman II),* 134 F.3d 1194, 1202 (2d Cir. 1998)); *see also In re*

*FirstEnergy Corp. Sec. Litig.,* No. 2:20-CV-3785, 2023 WL 8290917, at *8 (S.D. Ohio Nov. 29,

2023) (applying this standard and concluding, in part, that the investigation at issue would have

been prepared in substantially the same manner, regardless of the anticipated litigation); *McNeil*

*v. Mt. Carmel Health Sys.*, No. 2:20-cv-258, 2021 WL 5235103, at *4 (S.D. Ohio Nov. 10, 2021)

(Jolson, M.J.) (discussing that the question is "whether documents were 'prepared or obtained

because of the prospect of litigation,' as opposed to those 'prepared in the ordinary course of

business, or pursuant to public requirements unrelated to litigation, or for non-litigation

purposes[.]'" Both Perkins Coie's and OSU's evidentiary offerings are notably silent on this

issue.

The Court finds the analysis in *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96

(S.D.N.Y. 2007) to be particularly helpful in considering this question. Briefly, in that case,

Allied Irish Banks hired a consulting firm and a law firm to investigate and prepare a report on a

"rogue trading scheme" that allegedly had resulted in significant losses. The court found that the

documents underlying the report were not entitled to work product protection. In reaching its

conclusion, the court first considered "whether there existed any reasons other than the

anticipation of litigation for generating the materials." *Id*. at 106. The court found that issue to

be "easily resolved," in part, due to overwhelming contemporaneous evidence indicating that

there were business-related purposes for generating the materials. *Id*.

Similarly, the contemporaneous surrounding circumstances indicate that OSU had a business-related purpose for commissioning the Strauss Investigation and the corresponding Report supported by its underlying documents. Specifically, as Ms. Trombino confirms, in the wake of the Strauss allegations, OSU established a "dedicated webpage … prominently featured and accessible via [its] homepage (www.osu.edu)." (Declaration of Caryn L. Trombino, ECF No. 2-1 at ⁋ 9 "Trombino Decl.".)[5] A review of the Media tab on that dedicated webpage reveals an archive of contemporaneous information reflecting a series of University news releases, campus-wide emails from then President Michael V. Drake, and emails to alumni and former student-athletes.[6] Plaintiffs cite by way of example, one email from OSU's then President Michael V. Drake dated November 15, 2018, providing an update to Students, Faculty and Staff and describing the investigation as "aimed at uncovering the truth, understanding how this happened and working as a community to prevent any such incidents from occurring at Ohio State." (ECF No. 35 at 9.)[7] This particular email, however, is just one communication comprising OSU's very public response to the Strauss allegations. The dedicated webpage contains much more, beginning with a University news release dated April 5, 2018, announcing the Investigation and stating OSU's intention to "report the outcome of the investigation publicly

---

[5] https://straussinvestigation.osu.edu The same information appears to be available at https://compliance.osu.edu/strauss-investigation.html

[6] The Court may take judicial notice of these materials. *Willis v. Eureka Multifamily Grp., L.P.,* No. 220CV02145MSNCGC, 2021 WL 3519462, at *3 (W.D. Tenn. Aug. 10, 2021) (citing *CHS/Cmty. Health Sys., Inc. v. Med. Univ. Hosp. Auth.,* No. 3:20-CV-00163, 2021 WL 964047 (M.D. Tenn. Mar. 15, 2021), *vacated,* No. 3:20-CV-00163, 2022 WL 1658418 (M.D. Tenn. Mar. 18, 2022) ("The Court is able to take *sua sponte* judicial notice of the contents of a .edu website or a government website[.]")

[7] https://president.osu.edu/presidents/drake/news-and-notes/2018/a-message-from-president-drake-november-15-2018.html

upon its completion."[8]  Beyond this, it contains a cover page describing OSU's response to the Strauss Investigation, including, in part, covering the costs of counseling or medical treatment, establishing a task force on sexual abuse, and revoking Strauss' emeritus status.[9]

Without belaboring it, OSU's establishment and maintenance of the dedicated webpage is evidence of a business-related, public relations element to the Investigation.  Both Perkins Coie and OSU fail to address this issue.  Indeed, Perkins Coie offers only by way of argument that there was no dual purpose to the Investigation.  (ECF No. 73 at 13.)  That OSU faced public accountability concerns seems beyond debate given the circumstances.  This is so "even if those same issues overlap[ped] with anticipated litigation."  *In re FirstEnergy*, 2023 WL 8290917, at *8.  Thus, it is not difficult for the Court to conclude that there existed a non-litigation purpose for the Strauss Report and by extension the underlying documents.  Accordingly, the Court must now consider whether the Report and its underlying documents would have been created in substantially similar form based on this non-litigation purpose.  *Allied Irish Banks*, 240 F.R.D. 96, 106.

*Allied Irish Banks* continues to be instructive.  As that court explained, the question requires consideration of what would have happened absent the threat of litigation or, stated another way, whether the documents at issue would have been generated if OSU were acting solely for its business-related, public relations purposes.  The *Allied Irish Banks* court recognized that this calls upon the "factfinder to determine what 'would have' happened in some hypothetical situation."  *Allied Irish Banks*, 240 F.R.D. 96, 106.  And, in that case, as in this case,

---

[8] https://news.osu.edu/investigation-underway-into-allegations-of-sexual-misconduct-against-former-wrestling-team-physician

[9] https://straussinvestigation.osu.edu/media

it was impossible to imagine a scenario that did not include the potential for litigation. Nevertheless, that court proceeded to make its determination that the documents at issue were not protected work product. Two factors were significant to the *Allied Irish Banks* court in reaching its conclusion: (1) the lack of evidence regarding what would have been done in the absence of a litigation threat and (2) the circumstances surrounding the creation of the report.

Notably, in her Declaration, Ms. Paoletti does not speak to what OSU would have done if there was no threat of litigation. She also fails to affirmatively state that OSU would not have commissioned Perkins Coie's Report into the allegations surrounding Dr. Strauss absent the possibility of litigation. Instead, she states that the independence of the Investigation was not altered or influenced by the prospect of litigation. (Paoletti Decl., ECF No. 77-1 at ⁋ 12.) The same can be said of the information contained in Ms. Trombino's Declaration. Indeed, Ms. Trombino's Declaration also explains that the Investigation would have been undertaken in the same manner regardless of litigation. For example, she explains that, while Perkins Coie's "engagement, [its] investigative methodology, [its] internal and external communications, and [its] work product were all undertaken with … litigation risks at the forefront," this "anticipation of litigation in no way changed or influenced the independence or integrity of [its] investigation." (Trombino Decl*.,* ECF No. 2-1, at ⁋⁋ 6, 7.) Beyond this, Perkins Coie also acknowledges in its Reply that "the former athletes' detailed claims concerning Strauss would have surely triggered an investigation .…" (ECF No. 73 at 13.) Moreover, the contemporaneous circumstances surrounding the Investigation support the conclusion that OSU would have commissioned the Strauss Report regardless of the documented potential for litigation.

First, the fact that the Investigation was announced to the media indicates the "critical public accountability concerns that motivated the commissioning of the Report" and, by extension, "the creation of the underlying investigatory documents."  *Allied Irish Banks,* 240 F.R.D. 96, 107.  Again, such concerns are evident in OSU's creation of the dedicated Strauss Investigation webpage.  Further, Perkins Coie's Engagement Letter confirms the Independent Investigation was designed to assess and evaluate the allegations relating to Dr. Strauss and OSU's knowledge.  The Engagement Letter does not speak to the possibility of litigation.  On this same point, the publicly-released Report itself defines the Investigative Mandate as to "evaluate allegations that Strauss committed acts of sexual misconduct against members of the OSU community while he was employed by the University, and … to determine whether "the University" had knowledge of sexual misconduct allegations against Strauss during the relevant time period." (Report at 7.)  The defined Structure and Scope of Independent Investigation likewise does not address litigation concerns.  (*Id.*)  Finally, following OSU's release of the Report, President Drake announced the formation of a task force which would use the information detailed in the Strauss report and other sources to inform a safer future.[10]  Taken together, this information indicates OSU's concerns about its public perception as a major University capable of ensuring the safety of its students.  These are the types concerns that are not "addressed merely by hiring a teams of attorneys to litigate the complex factual and legal issues, in the hope that [OSU] would eventually be vindicated.'"  *Allied Irish Banks*, 240 F.R.D.96, 108 (quoting *In re Kidder Peabody Sec. Litig*., 168 F.R.D. 459, 465 (S.D.N.Y. 1996)).

---

[10] *See* email dated October 1, 2019, at https://president.osu.edu/story/strauss-update-october-2019

At bottom, it is Perkins Coie's responsibility to demonstrate that the Strauss Report and its underlying documents would not have been generated in the absence of litigation. It has not met its burden. At best, Perkins Coie's claim to work product protection seems to rest solely on the fact that the Investigation team was comprised of lawyers. That fact is insufficient to provide work product protection. *Allied Irish Banks*, 240 F.R.D. 96, 99; *see also Guo Wengui v. Clark Hill, PLC*, 338 F.R.D. 7, 13 (D.D.C. 2021) (finding that using counsel to undertake investigation appeared to have been designed to help shield material from disclosure and, therefore, was not sufficient in itself to provide work-product protection). Accordingly, the Motion to Quash will not be granted on the grounds of work product protection. Because the Court finds that the documents at issue are not protected work product, it will not consider the related issues of waiver or substantial need.

## IV.

The Court now turns to Perkins Coie's sweeping claim that the requested witness communications and written notes of those communications are protected by the attorney-client privilege. The elements of that privilege, which are long-established and not in dispute here, include the following:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998)) (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)). "'Because the attorney-client privilege may, however, serve as a mechanism for frustrating the investigative or fact-finding process, the privilege is to be narrowly construed.'" *Id.* (quoting *Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 177 (S.D. Ohio 1993)). The party asserting the privilege bears the burden of establishing the existence of

11

the privilege. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999). To be clear, Perkins Coie, citing the magnitude of its communications and notes and claiming undue burden, has not submitted a privilege log.

Perkins Coie's wholesale claim of attorney-client privilege as it relates to these sets of documents does not warrant lengthy analysis. As Perkins Coie makes clear, it considered its client to be Porter Wright. (ECF No. 73, n.1 "At all relevant times, Porter Wright was Perkins Coie's only client.") Plaintiffs represent that they are not seeking communications between Perkins Coie and Porter Wright such that the attorney-client privilege would be implicated. (ECF No. 35 at 11.) Again, Plaintiffs have confirmed that they seek only Perkins Coie's notes of communications with the witnesses described in Perkins Coie's Report and Perkins Coie's written communications with Non-Survivor witnesses. According to Plaintiffs, they seek these documents as to current and former OSU employees, third-party/non-OSU witnesses, and other student witnesses. Documents that are not confidential communications involving legal advice cannot be withheld on the basis of attorney-client privilege. *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-3785, 2023 WL 142078, at *2 (S.D. Ohio Jan. 10, 2023) (citing *United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1968) ("The mere fact that a person is an attorney does not render as privileged everything he does for and with a client.")). Thus, only documents that are confidential communications involving legal advice between Perkins Coie and Porter Wright can be withheld on the basis of attorney-client privilege.

Nevertheless, in the face of this reality, Perkins Coie offers several arguments in an effort to shield ***all*** of the requested documents under the terms of attorney-client privilege. None of them serve to persuade. For example, Perkins Coie maintains that it was retained to provide legal services to Porter Wright. Courts typically look to "the terms of an engagement letter to

12

determine the applicability of the privilege and whether legal advice was sought." *B.L. v. Schuhmann*, No. 3:18-CV-151-RGJ-CHL, 2020 WL 6293582, at *6 (W.D. Ky. Oct. 27, 2020). Notably, that Perkins Coie was engaged to provide legal services to Porter Wright is not reflected in the terms of their Engagement Letter submitted for *in camera* review to the Court.  Rather, that Letter, consistent with the representations set forth in the publicly-released Report, indicates that Porter Wright retained Perkins Coie to undertake an independent investigation to evaluate the Strauss allegations and to determine whether OSU had knowledge of those allegations.  At best, a boiler plate attachment to the Letter titled "Information for Clients" contains the phrase "legal services."   Nevertheless, Ms. Trombino states in her Declaration that Porter Wright's engagement of Perkins Coie "was structured such that Perkins Coie provided legal services and advice to Porter Wright in conducting the attorney-led independent investigation, for the purpose of assisting Porter Wright in its legal representation of [OSU]."  (Trombino Decl., ECF No. 2-1 at ¶ 4.)   Accepting Ms. Trombino's attestations, however, does not change the fact that, based upon the Court's *in camera* review, much of the information sought does not appear to relate to communications between Perkins Coie and its only client, Porter Wright.

To be sure, as Perkins Coie argues, courts have found an investigation of factual circumstances to be considered part of a package of legal services.  For example, in *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612 (7th Cir. 2010), a school board retained a law firm to undertake an internal investigation of the school administration's response to sexual abuse allegations and to provide legal services in connection with that investigation.  *Id*. at 616.  The law firm claimed that the interview notes and legal memoranda prepared by its attorneys in connection with the investigation were protected.  In reversing the district court and upholding the application of the privilege, the Court of Appeals for the Seventh Circuit rejected the lower

court's apparent assumption that when an attorney is acting in the role of an investigator, he or she is not acting as an attorney for purposes of the attorney-client privilege.  *Id*. at 618.  According to the appellate court, because the engagement letter contemplated both the investigation and the provision of legal services, the attorneys' confidential interviews with school district employees were protected.  This analysis would be applicable here under two scenarios:  (1) Perkins Coie had been retained directly by OSU to provide legal services and had undertaken its Investigation in the context of that representation or (2) OSU's retained counsel, Porter Wright, had undertaken the Investigation in conjunction with providing legal services to OSU.  Neither scenario represents what happened here.  Instead, accepting Ms. Trombino's statements, Perkins Coie was retained to provide legal services only to Porter Wright.  Perkins Coie has not demonstrated how an investigation involving communications with witnesses outside the confines of Porter Wright would fall within the realm of protected attorney-client communications.

Perkins Coie's other arguments in favor of the wholesale application of attorney-client privilege here are equally unavailing.  For example, it contends that Plaintiffs do not dispute that it provided legal advice to Porter Wright.  This argument ignores that Perkins Coie bears the burden of demonstrating the applicability of the attorney-client privilege in this case.  Further, Perkins Coie asserts that its communications with witnesses "*only* involved legal matters (that is, the allegations of Strauss' abuse)."  (ECF No. 73 at 20) (emphasis in original).  Discussing legal "matters" for purposes of making an independent assessment, however, is not the same as providing legal advice regarding how to handle it.  Additionally, that Perkins Coie marked certain documents as "Attorney Client Privileged" is not dispositive of the issue.  *Nat'l Day Laborer Org. Network v. United States Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 692

(S.D.N.Y. 2020) ("the label affixed to a document is not itself dispositive as to whether the privilege applies").

Perkins Coie also suggests that its use of "a form of an '*Upjohn* warning'" supports its extremely broad claim of attorney-client privilege.  (ECF No. 2 at 10.)  Briefly, in *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981), the Supreme Court found that investigations by counsel can trigger the protections of the attorney-client privilege.  Accordingly, "corporate attorneys often provide employees being interviewed so-called *Upjohn* warnings that may include an admonition that the attorney represents the corporation not the individual, the interview is a privileged conversation, and the corporation controls its own attorney-client [privilege.]" *Schuhmann*, 2020 WL 6293582, n.3.  As explained above, *Upjohn* has no applicability here because Perkins Coie did not undertake an investigation of the employees of its client, Porter Wright.  Also, the Court has reviewed the *Upjohn* warnings Perkins Coie provided to the interviewees.  Nothing in these "warnings" suggests that Perkins Coie was acting as counsel for OSU and, in fact, confirms just the opposite.  Moreover, nothing in these warnings suggests that interviewees were advised that the purpose of the investigation was to provide OSU with legal advice.  Indeed, the warnings confirm that Perkins Coie's attorneys were undertaking an Independent Investigation and acting as independent fact finders.  Under the circumstances here, "'[a] communication is not privileged simply because it is made by or to a person who happens to be a lawyer.'"  *Wadley v. Univ. of Iowa*, No. 420CV00366SMRHCA, 2022 WL 18780000, at *6 (S.D. Iowa June 24, 2022) (quoting *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977)).

This brings the Court to OSU's claim to be the holder of the attorney-client privilege.  In its motion to intervene, it states that "as the client, [it] holds and controls the attorney-client

15

privilege … has never waived the privilege, and … does not consent to the release of information protected by the attorney-client privilege." (ECF No. 29 at 3.) In its supplemental briefing addressed to the work product doctrine, it reiterates that position. (ECF No. 77 at n. 2.) Again, according to Perkins Coie, Porter Wright is Perkins Coie's client, *not* OSU.[11] Porter Wright was retained as Special Counsel to OSU. Whether the attorney-client privilege attaches to communications between OSU and Porter Wright is, of course, not at issue here.

As the Court recognized in its Order directing supplemental briefing, however, Perkins Coie made some suggestion of an argument rooted in an agency theory both in its initial motion and its reply. (ECF No. 75; *see also* ECF No. 2 at 9; ECF No. 73 at n.5.) For the most part, Perkins Coie's argument on this point remains largely undeveloped. Nevertheless, case law indicates that protected communications may include those between a client or client representative and an attorney or the attorney's representative so long as the conditions for attorney-client privilege are met. *See Flexider USA Corp. v. Richmond,* No. 3:19-0764, 2021 WL 6496809, at *3 (M.D. Tenn. Mar. 8, 2021). Having reviewed the *in camera* submissions, including the Engagement Letters and the language of the modified "*Upjohn* warnings" in particular, the Court finds any argument based on agency-related theory to be without merit.

The idea that in certain circumstances the attorney-client privilege may bar disclosures made by a client to agents of an attorney was recognized in *United States v. Kovel,* 296 F.2d 918, 921-22 (2d Cir. 1961). *Kovel,* however, typically is construed narrowly and limited to a third-party serving some specialized purpose in facilitating the attorney-client relationship. This is to

---

[11]The Court notes that this is Perkins Coie's position even though OSU was responsible for paying Perkins Coie's fees. (Trombino Decl., ECF No. 2-1 at ₱ 4.) Also, presumably due to this payment arrangement, the Engagement Letter between Perkins Coie and Porter Wright was signed by representatives for OSU.

ensure that application of the privilege protects communications between a client and an attorney, not communications that merely prove important to an attorney's legal advice to a client. *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). Here, there is no support in the record for the idea that Perkins Coie was acting, for example, in the way of a necessary intermediary or serving some other specialized purpose in facilitating the attorney-client relationship between Porter Wright and OSU. Indeed, the record indicates OSU's recognition that it could have undertaken the Investigation internally using its employees but opted not to. (DeWine Letter dated November 20, 2018, ECF No. 2-7.) Moreover, the interviews were undertaken independently by Perkins Coie without Porter Wright's involvement. That is, neither Porter Wright nor OSU "directed or otherwise sought to influence Perkins Coie's investigation." (Paoletti Decl., ECF No. 77-1 at ⊮ 14.) Indeed, Perkins Coie did not share the documents at issue here with either Porter Wright or OSU. (Trombino Decl., ECF No. 2-1 at ⊮ 24.) And, finally, to state the obvious, any agency argument would seem to undermine the proclaimed independence of the Investigation and the efforts undertaken to ensure that independence as touted by the Report and OSU.

In sum, Perkins Coie was retained to undertake an independent factual investigation. Certainly, Porter Wright may have found Perkins Coie's efforts in this regard useful to Porter Wright's ability to advise OSU regarding "the scope, significance, and legal risk and exposure flowing from Dr. Strauss' historical actions and the witnesses' recollections thereof." (Paoletti Decl., ECF No. 77-1 at ⊮ 14.) Such usefulness, however, is insufficient to extend blanket attorney-client protection to *all* of the documents Perkins Coie seeks to withhold here. Instead, Perkins Coie's claim of attorney-client privilege must be limited to only confidential communications involving legal advice between it and its client, Porter Wright. Although

Plaintiffs represent that they are not seeking such protected documents, for purposes of clarity,
the Motion to Quash is **GRANTED** and the subpoena is modified so as not to require the
production of any confidential communications involving legal advice between Perkins Coie and
its client, Porter Wright.  To the extent, however, that there may be any otherwise responsive
documents subject to withholding on the basis that they include legal advice between Perkins
Coie and Porter Wright, Perkins Coie must produce a privilege log.

## V.

Perkins Coie raises additional challenges to the subpoena as it relates to Plaintiffs' requests
for witness communications and written notes of those communications.  For example,
Perkins Coie claims that disclosure would violate survivors' privacy rights.   Plaintiffs have
clarified, however, that they are not seeking the identity of, notes of communications with, or
communications with the 177 survivor witnesses.  (ECF No. 76.)  That is, Plaintiffs' requests are
limited to the Non-Survivor Witnesses.  Accordingly, the Court will not address Perkins Coie's
argument on this issue at this time other than to note that Perkins Coie failed to explain how any
potential confidentiality concerns could not be addressed by an appropriate protective order.

Perkins Coie also argues that the Family Educational Rights and Privacy Act ("FERPA")
protects the information Plaintiffs seek and that disclosure of survivor information violates
privacy rights.  In reply, Perkins Coie argues that Plaintiffs failed to respond to its FERPA
argument and therefore have conceded the point.  The Court disagrees as to both arguments.

Congress enacted the FERPA "to protect [parents' and students'] rights to privacy by
limiting the transferability of their records without their consent." Joint Statement, 120 Cong.
Rec. 39858, 39862 (1974).  *United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2002).
The Act broadly defines "education records" as "those records, files, documents, and other

18

materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). *Id*. at 807.

Perkins Coie fails to explain how the information Plaintiffs seek here falls within FERPA's definition of education records. Perkins Coie is not "an educational agency or institution." Nor, as explained above, can Perkins Coie be deemed to be acting for such an agency or institution in undertaking an independent investigation for its client, Porter Wright, a private law firm and not an educational institution. Additionally, Perkins Coie has not addressed the applicability of FERPA to witness statements made not by students but by former OSU employees, current OSU employees, or third party/non-OSU witnesses.

Beyond this, district courts have held that "student witness statements are not governed by FERPA." *Ellis v. Cleveland Mun. Sch. Dist*., 309 F.Supp. 2d 1019, 1022 (N.D. Ohio 2004). Additionally, courts have held that,

> incident reports relating to non-educational matters "are not educational records because, although they may contain names and other personally identifiable information, such records relate in no way whatsoever to the type of records which FERPA expressly protects; *i.e*., records relating to individual student academic performance, financial aid or scholastic probation which are kept in individual student files."

*Cummerlander v. Patriot Preparatory Acad.*, No. 2:13-CV-0329, 2013 WL 12178140 at *1 (S.D. Ohio Sept. 13, 2013) (*quoting Bauer v. Kincaid*, 759 F.Supp. 575, 591 (W.D. Mo. 1991)). Further, this Court has found that the limitations on disclosure imposed by FERPA do not apply to production of documentation relating to student complaints of sexual harassment against a particular employee. *Briggs v. Board of Trs. of Columbus State Cmty. Coll.*, No. 2:08-CV-644, 2009 WL 2047899 at *5 (S.D. Ohio July 8, 2009). Accordingly, the Motion to Quash will not be granted on the basis of FERPA.

This brings the Court to the matter of whether responding to Plaintiffs' current requests for all interview notes and witness communications relating to the approximately 343 Non-Survivor witnesses presents an undue burden to Perkins Coie. Ms. Trombino explains that Perkins Coie's investigation generated at least 29 GB of email data or approximately three million pages. (Trombino Decl., ECF No. 2-1 at ¶ 22.) Additionally, the electronic document management system Perkins Coie created for the Investigation holds 24.5 GB of data, comprising 3458 files of various types. (*Id.*) Indeed, the documents relating to only ten representative witnesses submitted to the Court for *in camera* review consumed three large binders.

A brief discussion of Perkins Coie's submission is in order. For each representative witness, Perkins Coie submitted written communications with that witness and the notes of Perkins Coie's communications with that witness, segregated by these two categories. Perkins Coie also submitted a cover letter setting forth a few logistical points to aid in the Court's review. It represents that it also provided a copy to Plaintiffs' counsel. The cover letter describes a tracking spreadsheet for each witness detailing witness contacts and information exchanged during those contacts. It further explains that a draft memorandum of each interview was put together. In some instances, final memoranda of interviews were prepared but in others the memoranda remain in draft form with underlying notes.

The Court's review of these representative samples indicates that, with respect to the requested written communications with witnesses, these documents relate largely to the logistics of scheduling an interview. Consistent with Perkins Coie's representations, this information appears to be reflected on the spreadsheet prepared for each witness. As such, Plaintiffs' request for written communications with a witness appears largely to be subsumed within the request for

Perkins Coie's interview notes. Also consistent with Perkins Coie's representations, the "Notes of Communications" category includes a memorandum of each initial interview and, in some cases, a second or follow-up interview. These memoranda appear to be a summary of the underlying notes.

In light of its review of Perkins Coie's *in camera* submission, and keeping in mind the issue of undue burden, the Court resolves the Motion to Quash as follows. The Motion is **DENIED, in part,** to the extent that Perkins Coie is **DIRECTED** to produce the spreadsheets relating to each of the Non-Survivor witnesses interviewed in the same excerpted format included in the *in camera* submission. Further, for these same Non-Survivor witnesses, Perkins Coie is **DIRECTED** to produce the interview memoranda, in either final or draft form, as applicable. At this time, the Motion to Quash is further **HELD IN ABEYANCE, in part,** with respect to the remaining documents reflecting written communications with the Non-Survivor witnesses or Perkins Coie's notes of communications with those witnesses. After completing the review of this initial round of documents, Plaintiffs are **DIRECTED** to confirm whether they continue to seek **all** remaining documents or intend to limit the scope of their request to a more targeted set of documents.

## VI.

Perkins Coie also claims that the subpoena was "duplicative of information [Plaintiffs could] more easily obtain from OSU." (ECF No. 2 at 13.) This objection relates to Plaintiffs' request for "OSU records which Perkins Coie uploaded into its electronic discovery database." On this point, Perkins Coie explains that historical OSU documents already are available to Plaintiffs because neither it nor OSU has asserted privilege over the documents cited in the Report which are publicly available on OSU's website. To the extent Plaintiffs seek OSU

records unavailable online, Perkins Coie asserts that Plaintiffs should seek any such records directly from OSU.

The state of the record on this issue is not particularly clear.  Accordingly, in the interest of efficiency, the Court resolves this issue as follows.  Counsel for Perkins Coie is **DIRECTED** to certify within **THIRTY DAYS** of the date of this Opinion and Order that all documents responsive to Plaintiffs' request for the "OSU records which Perkins Coie uploaded into its electronic discovery database" are the same documents publicly available to Plaintiffs via the OSU website.  If the sets of documents are not identical, in the certification, counsel for Perkins Coie is **DIRECTED** to identify the categories of documents uploaded into its electronic discovery database not publicly available to Plaintiffs via the OSU website.  Within **FOURTEEN DAYS** of the filing of this certification, counsel for Perkins Coie and Plaintiffs are **DIRECTED** to meet and confer regarding the production of any non-privileged material responsive to Plaintiffs' request but not publicly available.  In the event agreement cannot be reached, counsel may contact the Court for further assistance.

**VII.**

For these reasons, the Motion to Quash (ECF No. 2) is **GRANTED, in part**, and **DENIED, in part, as follows.**   The Motion to Quash is **GRANTED** and the subpoena is **MODIFIED** so as not to require the production of any confidential communications involving legal advice between Perkins Coie and its client, Porter Wright.  As explained above, for any otherwise responsive documents withheld on this basis, Perkins Coie must produce a privilege log.

With respect to all categories of documents aside from the OSU records which Perkins Coie uploaded into its electronic discovery database, the Motion is **DENIED, in part,** to the

extent that Perkins Coie is **DIRECTED** to produce the spreadsheets relating to each of the Non-Survivor witnesses interviewed in the same excerpted format as used for the *in camera* submission. Further, for these same Non-Survivor witnesses, Perkins Coie is **DIRECTED** to produce the interview memoranda, in either final or draft form, as applicable. Because the subpoena was issued in the original *Snyder-Hill* matter, Case No. 2:18-cv-736, such production shall be made to counsel in the current *Snyder-Hill* action, Case No. 23-cv-2993 **WITHIN THIRTY DAYS OF THE DATE OF THIS OPINION AND ORDER**. At this time, the Motion to Quash is further **HELD IN ABEYANCE, in part,** with respect to the remaining documents reflecting written communications with the Non-Survivor witnesses or Perkins Coie's notes of communications with those witnesses. After completing the review of the initial round of produced documents, Plaintiffs are **DIRECTED** to confirm whether they continue to seek the remaining documents as to all witnesses or intend to limit the scope of their request to a more targeted set of documents.

With respect to the "OSU records which Perkins Coie uploaded into its electronic discovery database," counsel for Perkins Coie is **DIRECTED** to certify within **THIRTY DAYS** of the date of this Opinion and Order that that all documents responsive to Plaintiffs' request for the "OSU records which Perkins Coie uploaded into its electronic discovery database" are the same documents publicly available to Plaintiffs via the OSU website. If these sets of documents are not identical, in the certification, counsel for Perkins Coie is **DIRECTED** to identify the categories of documents uploaded into its electronic discovery database not publicly available to Plaintiffs via the OSU website. Within **FOURTEEN DAYS** of the filing of this certification, counsel for Perkins Coie and Plaintiffs are **DIRECTED** to meet and confer regarding the production of any non-privileged material responsive to Plaintiffs' request but not publicly

23

available.  In the event agreement cannot be reached, counsel may contact the Court for further assistance.

      **IT IS SO ORDERED.**

**Date: May 8, 2024**

                         */s/ Elizabeth A. Preston Deavers*
                         **ELIZABETH A. PRESTON DEAVERS**
                         **UNITED STATES MAGISTRATE JUDGE**